**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| **Jeannie Quinteros** | ) | **Case No:** 18-1405 |
| **717 D St. NW** | ) | |
| **Washington, DC 20004** | ) | **Civil Complaint for Violation of Title VII** |
| **Plaintiff,** | ) | **42 U.S.C. § 2000 et seq; 42 U.S.C. § 12111** |
| | ) | **et seq, 42 U.S.C.  § 1981 and Virginia** |
| **vs.** | ) | **state law claims.** |
| | ) | |
| **Burlington Coat Factory** | ) | **Jury Demand** |
| **1830 Route 130 North** | | |
| **Burlington, NJ 08016** | | |

**and**
**Angela Faith Britt Buhite**
**1424 Kemp Bridge Lane**
**Chesapeake, VA 23320**

 **Defendants**

---

## INTRODUCTION

Plaintiff Ms. Jeannie Quinteros (Jeannie), by and through her undersigned counsel file

this Civil Complaint for sex, pregnancy and race discrimination, hostile work environment, and

retaliation under Title VII 42 U.S.C. § 2000 (e) *et seq.,* discrimination and retaliation based on

disability under the Americans with Disabilities Act Amendments Act of 2008 (ADAAA), for

race discrimination and retaliation under 42 U.S.C. § 1981  and intentional and negligent

infliction of emotional distress under Virginia state common law against the Defendants

Burlington Coat Factory and the Regional Vice President Angela Faith Britt Buhite, as an

individual.

Jeannie, an African-American female, was a store manager for Burlington Coat Factory

in Virginia from January 13, 2017-November 42017. Throughout her employment, Jeannie was

subjected to continual discriminatory, harassing and retaliatory behavior because of her pregnancy, sex, disability and race. This behavior caused Jeannie both great physical injury and emotional distress. These physical injuries include, but are not limited to, dangerous exacerbation of life-threatening preeclampsia, emergency surgery, premature birth, breast engorgement, irreversible cessation of breastfeeding, and the permanent loss of the ability to have more children. These physical injuries and Burlington's discriminatory, harassing and retaliatory behavior caused Jeannie to experience extreme anxiety, depression and emotional distress, which continues to this day.

## PART I. PARTIES

1. Jeannie Quinteros is an African-American female and the mother of one child. She began her employment with the Burlington Coat Factory on or about January 13, 2017 and was terminated from her position on November 4, 2017. Jeannie is an employee under 42 U.S.C. § 2000(e) *et seq*.

2. The Burlington Coat Factory is a large retail corporation with storefront locations throughout the United States. Burlington's corporate headquarters are located in New Jersey. Jeannie was employed at the Seven Corners, VA location. Burlington is an employer under 42 U.S.C. § 2000(e) *et seq.*

3. Angela Faith Britt Buhite, is the Regional Vice President of the Burlington Coat Factory. She regularly visits the Seven Corner, VA location, and holds meetings and conversations regarding the operation of the store. Buhite has minimum contacts with this state, and is individually liable under 42 U.S.C §1981 for the intentional infringement of Plaintiff's rights. *See Wright v. StoneMor Partners LLP*, No. 3:12-cv-380, 2012 U.S. Dist. LEXIS 129593, at *4 (W.D.N.C. Sep. 12, 2012) ("[I]ndividual supervisors can only be held

liable under Section 1981 if they 'intentionally cause an employer to infringe upon' the rights secured by that statute. [quoting *Tillman v. Wheaton-Haven Recreation Association,* 517 F.2d 1141, 1145 (4th Cir. 1975)"). Buhite can also be held liable under Virginia state common law claims.

## PART II. JURISDICTION & VENUE

4. This Court has jurisdiction of this action under 28 U.S.C. §1331, 28 U.S.C §1343 (4) and 42 U.S.C. §2000(e)-(5) f in order to protect rights guaranteed by 42 U.S.C §1981; Title VII of the 1964 Civil Rights Act, 42 U.S.C. §2000 (e) *et.seq* and 42 U.S.C. § 12111 *et seq,*. This court has supplemental jurisdiction over the Virginia state law claims.

5. Venue is proper in this Court because the Defendant has sufficient contacts with the venue. The plaintiff was employed and terminated by Burlington while working at the Burlington store in Seven Corners, Virginia and all the events and allegations contained in this action occurred in Virginia.

## PART III. EXHAUSTION OF ADMINISTRATIVE REMEDIES

6. On or around January 13, 2017 Jeannie opted out of Burlington's STEP arbitration program by mail and again sent the opt-out form by fax on January 20, 2017. (Exhibit 1: STEP Program Opt Out Form).

7. On August 7, 2018, Jeannie filed her charge (Form 5) with the Fairfax County Office of Human Rights and Equity Programs, which was cross filed with the U.S. Equal Employment Opportunity Commission (EEOC) alleging discrimination under the protected categories of sex and retaliation. The charge number is: 570-2018-02892.

8. On August 14, 2018 the U.S. EEOC issued Plaintiff the right to sue on charge number 570-2018-02892. She received her right to sue on or about August 20, 2018.

9. On August 28, 2018, Jeannie filed a second charge (Form 5) with the U.S. Equal
   Employment Opportunity Commission (EEOC) alleging race and disability
   discrimination, along with retaliation. The charge number is: 570-2018-03318.

10. On September 5, 2018 the U.S. EEOC issued Jeannie the right to sue on charge number
    570-2018-03318. This right to sue was received on or about September 10, 2018 by the
    Plaintiff.

11. On November 12, 2018, an action was timely filed with this Court within the 90 day
    period of filing suit under 42 U.S.C.§ 2000(e)-5(f)(1).

12. Jeannie has no further administrative obligations.

## PART IV. STATEMENT OF FACTS

13. Jeannie was employed by the Burlington Coat Factory as a Store Manager at the 6350
    Seven Corners Center, Seven Corners, VA 22044 location from January 13, 2017 to
    November 4, 2017.

14. Jeannie is an African-American female.

15. Jeannie was a salaried employee and earned $83,000 a year.

16. Jeannie's duties included managing and overseeing the operations of the store and the
    store employees.

17. The prior store manager to Jeannie was a white male.

18. All of Jeannie's supervisors were white.

19. Jeannie's direct supervisor was Angela Faith Britt Buhite, Regional Vice President of
    Burlington Stores.

20. Buhite is a Caucasian female.

21. Buhite was the only female regional manager in Jeannie's region.

22. Jeannie was one of only a few store managers who were people of color in the region and the only pregnant store manager.

23. All of Jeannie's direct reports were people of color except for one white employee.

24. Jeannie was told she would work 40 hours per week on a salaried basis.

25. In fact, Jeannie regularly worked over 40 hours in a week and regularly was made to stay past midnight in the store.

26. Jeannie managed a store with roughly 30,000 square feet of space and was made to walk throughout the store continually while at work.

**Jeannie is diagnosed with preeclampsia.**

27. In late January or early February 2017, Jeannie and her husband learned that she was pregnant. Jeannie's due date was July 27, 2018.

28. On or around February 2017, Jeannie's doctor diagnosed her with preeclampsia, meaning that she had a high-risk pregnancy.

29. Preeclampsia is a potentially life-threatening condition which causes high-blood pressure in pregnant women. Other symptoms of preeclampsia include swelling of the feet, hands and face, headaches, and shortness of breath.[1]

30. Preeclampsia is a disability as contemplated under the Americans with Disabilities Act Amendments Act of 2008 (ADAAA). Preeclampsia limits the following major life activities: walking, standing, lifting, concentrating at work and performing manual tasks.

31. Due to the preeclampsia, Jeannie's doctor told her she would need to visit the doctor at least once every two weeks during her pregnancy.

---

[1] *Preeclampsia*, https://www.mayoclinic.org/diseases-conditions/preeclampsia/symptoms-causes/syc-20355745 (last visited Nov. 4, 2018).

32. Jeannie's doctor told her she would need the following accommodations at work in order to prevent her and her baby's blood pressure from raising to a dangerous level: a prohibition on standing for long periods, walking for long periods, going for long periods without water and from lifting boxes over 20 pounds.

33. Jeannie's doctor told her she could not stand for over one hour at a time. Anytime Jeannie had been standing for a long period of time, she needed to sit down and elevate her feet.

34. The aforementioned accommodations would have allowed Jeannie to perform the essential functions of her position as a store manager. These accommodations would not have been an undue burden for the Defendant.

35. During the appointment, Jeannie worried that she would be fired if she told her employer. The doctor insisted that she tell her employer for the safety of her and her baby.

**Jeannie notifies Burlington that she has a high-risk pregnancy and requests accommodations. Burlington denies her the accommodations sought.**

36. On February 28, 2017, Jeannie emailed Territory Human Resources (HR) Director Kathy Harrison (white, non-pregnant female), in which she notified Burlington about her high-risk pregnancy and asked for pregnancy and disability-related accommodations.

37. Burlington's HR department never approved her request for accommodations.

38. Instead, Jeannie's supervisor Buhite (Regional Vice President, white, non-pregnant female) called Jeannie on or about March 1, 2017 to let Jeannie know she had heard about her request for high-risk pregnancy accommodations.

39. On the call, Buhite asked Jeannie the following questions: (i) why did she not inform Buhite that she was pregnant, (ii) how many more children does Jeannie plan to have, (iii) how many children does Jeannie have now, (iv) whether Jeannie used any kind of birth control and (v) whether Jeannie would return to work after giving birth to her baby.

40. Jeannie then informed Buhite that the doctor told her she had a prohibition on standing for long periods, walking for long periods, going for long periods without water and from lifting boxes over 20 pounds.

41. Buhite replied that she (Buhite) "couldn't make any promises" about the accommodations and that she would need to ask Troy (last name unknown, territory manager, white, male).

42. Also on or around March 1, 2017, Harrison called Jeannie and said she needed a doctor's note for the accommodations.

43. On or around March 7, 2017, Jeannie questioned Buhite on the status of her accommodation request.

44. Buhite again replied that she didn't know and would have to get back to her.

45. On or around March 2017, Jeannie went to her doctor to get a note for her accommodations. At that time, Jeannie was assigned to a specialist due to the severity of her preeclampsia.

46. The doctor's note stated that Jeannie should not be standing for long periods, walking for long periods and should not be lifting boxes over 20 pounds.

47. On or around March 15, 2017, Jeannie handed the doctor's note to Harrison.

48. Neither Harrison, Buhite, or anyone else at Burlington responded to Jeannie's request for accommodations.

49. Had the Defendant provided the Plaintiff with her request for accommodations, the Plaintiff would have been capable of performing the essential functions of her position.

50. The accommodations sought were not an undue burden for the Defendant.

**Jeannie's working conditions exacerbate her preeclampsia.**

51. Throughout her pregnancy, Jeannie was asked to stand on her feet for long periods of time, carry heavy boxes, and go without water.

52. Due to standing for long periods, Jeannie suffered from debilitating backaches, large and painful hemorrhoids, tiredness, lethargy, blood clots, and dizziness.

53. Due to her preeclampsia and standing for too long, Jeannie fainted at work 3-4 times. Store associates would help catch her and walk her to the back of the store to rest. After only a brief rest, Jeannie was made to return to work.

54. Starting in June 2017, Jeannie also suffered from contractions about once a week while at work. These contractions were painful and made Jeannie feel faint.

55. Because Jeannie was refused accommodations under the ADAAA, her face, ankles, and hands were continually and painfully swollen to the point where she often could not walk, her legs were numb and she was in constant excruciating pain.

56. Throughout her pregnancy, Jeannie's doctor told her that her preeclampsia was worsening due to her stressful conditions at work.

**Buhite continually denies Jeannie's multiple requests for disability accommodations and engages in pregnancy discrimination.**

57. Throughout Jeannie's pregnancy, Buhite would often ask Jeannie when she would be taking maternity leave. Buhite would also tell Jeannie it would be very hard for Jeannie to return to work after having a baby, especially during the important fourth quarter holiday and shopping season.

58. These conversations immediately gave Jeannie anxiety, because she felt she would be terminated by Buhite due to her pregnancy.

59. Several times Jeannie followed her doctor's orders and sat down while on the job because her legs and feet were extremely swollen and painful.

60. Once in late June or early July 2017, an associate contacted Buhite to say that Jeannie had been sitting in her office. Buhite then called Jeannie to confront her. Jeannie stated that she needed to sit due to her preeclampsia.

61. Buhite said that Jeannie needed to get back to work right away.

62. While at the cash register, Jeannie would sit.

63. Jeannie could perform the essential functions of operating a cash register while sitting.

64. Buhite also refused to allow Jeannie to drink water while at the register, even though Jeannie's doctor advised her to drink water regularly.

65. Jeannie could perform the essential functions of her position to operate a cash register while drinking water.

66. The request for a chair for sitting and to drink water are requests for reasonable accommodations and are not an undue burden to the Defendant.

67. Another pregnant employee (name possibly Nabila, of middle-eastern descent) was also told that she could not sit at the register.

68. This Middle-Eastern employee was eventually forced to quit her job because of Burlington's pregnancy discrimination and lack of accommodations.

69. Because of Buhite's biases and discriminatory beliefs towards pregnant employees, Buhite also treated Jeannie unfairly when she gave Jeannie less staffing hours than similarly situated non-pregnant store managers.

70. In April or May 2017, Jeannie requested that Buhite provide additional staffing in case she had to leave the store in an emergency situation due to her preeclampsia.

71. Buhite refused.

72. Because of this, Jeannie worked under continual extreme stress, agitation and fear.

73. In April or May 2017, at a regional meeting, Buhite introduced Jeannie to two other colleagues (Cheryl and Cindy, store managers, white, non-pregnant females). Buhite said "can you believe she's pregnant? I had no idea. Honestly, I had no idea!" Jeannie felt embarrassed, ridiculed and singled-out.

74. In May 2017, Jeannie had an important doctor's appointment because it was believed that her baby had a genetic disorder.

75. Buhite ordered Jeannie to reschedule this appointment.

76. Jeannie was made to reschedule the appointment for two weeks later, causing her emotional stress, which affected her ability to concentrate at work.

77. Once an associate noticed that Jeannie was in pregnancy-related pain and told her she should go home and rest. Buhite then reminded Jeannie that she was not eligible for any leave under the FMLA, implying that Jeannie could not go home.

78. Once in May 2017, Jeannie had to leave during a shift to go to the hospital due to the pain and swelling. After the end of the doctor's visit, Jeannie had to return immediately to work.

79. Buhite would frequently accuse Jeannie of having "pregnancy brain." Once Buhite, in response to a comment made by Jeannie, said to her: "that is the stupidest thing I've ever heard...must be the pregnancy brain."

80. Buhite once said to Jeannie: "you look really skinny," meaning that Jeannie's body was not an appropriate size for her pregnancy. But with the workload, Jeannie did not have time to eat.

81. Buhite also called Jeannie "prego," short for pregnancy or pregnant, more than 10 times. After this, a few other employees also started referring to Jeannie as "prego."

82. Jeannie was extremely offended by the use of the word "prego" towards her. This constant harassment based on her sex, pregnancy and/or disability status made it difficult for her to concentrate at work. Jeannie would frequently cry.

83. The use of the word "prego" to describe Jeannie singled her out on the basis of sex, pregnancy and/or disability.

84. In June 2017, Buhite took issue with Jeannie sitting at the register. Buhite said it "looked bad and was a bad example" and instead made Jeannie stand.

85. Once in June 2017, Jeannie worked from 2 pm until 4 am the next day to prepare for a visit from Buhite. Jeannie's swelling in her face, ankles and hands became so bad that she could barely walk. Jeannie had to leave the store before the work was done.

86. Buhite came the next day and asked Jeannie why she left early (at 4 am). Jeannie told Buhite that her preeclampsia had been exacerbated. Buhite responded by saying that she should not have left the store.

87. In late-June/early-July 2017, Jeannie experienced strong and painful contractions while at work. Jeannie immediately when to the emergency room and was admitted for an overnight stay.

88. Jeannie called Buhite to alert her that she had been admitted to the hospital. Buhite only responded with questions about when she would return to work. Buhite did not express concern for Jeannie's well-being and did not tell her to take any time to rest.

89. Buhite's tone and verbal remarks demonstrated annoyance, irritation and indifference.

90. Upon her release the next morning, her doctor ordered Jeannie to go home and rest. Her doctor said that her health condition was dangerous for her and her baby.

91. Instead, Jeannie returned immediately to work, knowing that Buhite would not permit her to take any time off.

92. Throughout her pregnancy, Jeannie considered quitting her job because she was worried that she would not be able to have a healthy and safe pregnancy due to the working conditions. However, financially Jeannie was unable to quit.

**Buhite discriminates against Jeannie on the basis of sex, gender stereotypes and race.**

93. On Buhite's first visit to Jeannie's store, Buhite gave Jeannie the following advice: "never come off as too emotional. This will make it easier for you as a woman, especially when the team is used to being led by a man."

94. Jeannie was often made to do the work of 4-5 people because she was not given the staff she needed from Buhite. Jeannie believed that Buhite was understaffing her store in order to retaliate against her because she was a woman and because of her pregnancy.

95. Jeannie noticed that fellow store manager Eddie (last name unknown, male, white) was given sufficient staffing from Buhite to successfully run his store.

96. Buhite exercised a discriminatory discipline policy at her store(s). She was unforgiving of mistakes made by female employees, while lax on any discipline of male employees.  For instance, Sonik Song (Asian-American, male, assistant store manager) was given wide allowances by Buhite to make mistakes. Jeannie was not afforded the same treatment.

97. Sonik's area was the back of the store and his area was not clean or well organized. Buhite did not discipline Sonik.

98. Buhite ordered Jeannie to put two female employees (Karen Williams, black and Patricia Petrie, white) on a performance improvement plan, even though they had good performance. Conversely, Buhite refused Jeannie's request to put Sonik on a performance improvement plan, even when he had poor performance.

99. Jeannie once recommended a male for a merchandising manager position to Buhite. Buhite responded that a female would be better in that position because it entailed design.

100. Buhite also told Jeannie that men should be in certain positions which required more strength and women should be in certain positions which required more design skills. Buhite did not consider the skills of the employees in their placement, but instead based positions on gender stereotypes.

101. Buhite also commented that a different supervisor was stronger than Jeannie because he was a male.

102. Buhite once requested that Jeannie "break up the estrogen in the store,"

103. Buhite made this remark, because in Buhite's opinion there were too many female employees in the store.

104. Buhite also informed Jeannie she "would have to forget her kids" if she wanted to move into the district manager role.

105. Buhite said that the job would require her to be on the move constantly and not be "bogged down" by children.

106. Buhite stated her role as a regional manager with children has been difficult and she "didn't really see other women being able to do it."

107. Store associates Patricia Petrie and Karen Williams warned Jeannie that Buhite was harder on women and engaged in gender-based stereotypes.

108. Karen Williams (black, female) told Jeannie that she had called the Burlington Employee Hotline to complain about Buhite's discriminatory behavior, including discrimination possibly based on sex, age and race.

109. Jeannie also observed that Buhite would speak to her and other black employees differently from white employees, in a tone that was harsh, dismissive, abrupt and condescending. Buhite would speak to white employees kindly and with a polite tone.

110. Due to Buhite's differential treatment, Jeannie believed that Buhite saw herself and other white people as superior over black persons.

111. Because of the constant race, sex, pregnancy and disability harassment Jeannie endured from Buhite, Jeannie would on a daily basis return from home in tears. Jeannie began to doubt her abilities as a manager and as a future mother. This daily crying continued throughout her employment and it affected her ability to work.

**Due to the work stress, Jeannie's baby is born prematurely through emergency c-section and Jeannie loses the ability to have any more children.**

112. In June 2017, Jeannie's doctor ordered her to have six to eight weeks of bed rest before her due date. Based on Burlington's past practice of denying Jeannie any accommodations concerning her pregnancy, Jeannie knew Burlington would not allow this and instead scheduled her maternity leave for three weeks before her due date.

113. Burlington did not offer Jeannie any paid maternity leave. Jeannie instead had to take short-term disability, paid for 8 weeks at 70% of her salary.

114. All the stress from worked caused Jeannie's baby to have an accelerated heart rate, which caused her to have premature labor and an emergency cesarean section on July 8, 2017, three weeks before her due date.

115. Jeannie was unable to have any bed rest before her emergency c-section.

116. Jeannie's doctor said her emergency c-section would take 12 weeks to heal, considerably longer than a vaginal birth.

117. The ill health effects from premature birth for the baby included underdeveloped lungs, jaundice, general sickness, fever and irregular heartbeat.

118. Due to these ill effects, Jeannie and her baby had to stay in the hospital for three weeks. The hospital stay caused Jeannie considerable stress and costs.

119. During these three weeks, Jeannie suffered from migraine headaches while her son suffered from delayed responsiveness, fever, jaundice, lung infection and rapid heartbeat.

120. After the birth, Jeannie's doctor informed her that it will be too dangerous for her to have additional children because of the emergency c-section. Jeannie was devastated because she and her husband had planned on having more children.

**Buhite engages in pregnancy, disability and sex-related discrimination during Jeannie's maternity leave.**

121. From July 6, 2017 to September 4, 2017, Jeannie was on maternity leave.

122. In August 2017, Buhite called Jeannie to inform her that she needed to book a flight for a fall work trip.

123. Buhite also inquired if Jeannie was planning to return to work. Jeannie said, "Yes."

124. Buhite replied that it was going to be tough for Jeannie to return to work because she just had a baby, saying that the work would be difficult for a mother of a newborn to complete. Buhite sounded irritated that Jeannie planned on returning.

125. Buhite also called a second time during Jeannie's maternity leave and asked if she was coming back to work. Again, Jeannie said she was returning.

126. Once again Buhite, in an irritated tone, said that it was going to be really tough for Jeannie to return to work after her pregnancy because she just had a baby.

**Jeannie returns to work with disability related restrictions.**

127. On September 4, 2017, Jeannie returned to work, only 9 weeks after the birth of her child.

128. Jeannie's doctor told her it would take 12 weeks for her to heal from her c-section.

129. Jeannie's doctor ordered her to not lift boxes over 20 pounds and to pump her breast milk fully and regularly while at work.

130. Burlington was notified through Metlife Insurance that Jeannie had surgery.

131. During the first week of September 2017, Buhite questioned if she was ready to lead the store after having a child. Buhite also opined that it would be tough for Jeannie to lead the store during the fourth quarter because of her newborn baby and the upcoming holiday season.

132. Buhite said that, "fourth quarter at Burlington is not like other retail" and questioned whether Jeannie could do the job with a newborn.

133. On or about September 20, 2017, Buhite questioned Jeannie about her newborn son's childcare arrangement, telling her she had "three weeks to figure out what to do with her son."

134. Jeannie noticed that Buhite had severely cut the number of hours for her staff to even less than before her maternity leave, making it difficult to successfully manage her store. Jeannie felt that Buhite intentionally cut hours as retaliation for returning after maternity leave. Jeannie felt that Buhite was setting the stage for her eventual termination from Burlington.

135. Buhite's actions and words towards the Plaintiff, were motivated by discriminatory animus towards Jeannie's protected class.

**Burlington denies Jeannie a place to pump her breast milk.**

136. In 2002, the Virginia House of Delegates and Virginia Senate enacted House Joint Resolution 145, which encourages employers to recognize the benefits of breastfeeding and to set aside appropriate space for such activities.[2]

137. For women who are lactating, being unable to pump breast milk in a timely manner can cause physical problems, including clogged ducts, engorgement, infection, pain, and emotional distress.[3]

138. For women who are lactating, being unable to pump breast milk in a timely manner can cause a reduction in milk supply.[4]

139. For infants, "not being breastfed is associated with an increased incidence of infectious morbidity, as well as elevated risks of childhood obesity, type 1 and type 2 diabetes, leukemia, and sudden infant death syndrome."[5]

140. For mothers, "failure to breastfeed is associated with an increased incidence of premenopausal breast cancer, ovarian cancer, retained gestational weight gain, type 2 diabetes, myocardial infarction, and the metabolic syndrome."[6]

141. Jeannie and her husband both desired for their son to be breastfed for at least 12 months or longer.

142. Upon her return from maternity leave, Jeannie requested a private place to pump her breast milk.

---

[2] *Virginia's Legislative Information System, 2002 Resolutions*, https://lis.virginia.gov/cgi-bin/legp604.exe?021+ful+HJ145ER (last visited Oct. 11, 2018).

[3] *See Women Who Have To Delay Pumping Risk Painful Breast Engorgement*, https://www.npr.org/sections/health-shots/2016/05/26/479288270/women-who-have-to-delay-pumping-risk-painful-breast-engorgement (last visited Oct. 10, 2018).

[4] Id.

[5] *See The Risks of Not Breastfeeding for Mothers and Infants*, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2812877/ (last accessed Oct. 10, 2018).

[6] Id.

143. Buhite told Jeannie to clean out the storage room by herself and then use that to pump her breast milk.

144. The storage room was completely full of boxes of merchandise which weighed between 25-50 pounds.

145. The janitors used the storage room to store their cleaning supplies, which included harsh chemicals, including floor cleaner, toilet cleaner and bleach.

146. The storage room was also infested with rats and mice, meaning that the room was full of feces, making it an unsanitary place to pump breast milk.

147. Jeannie told Buhite that the storage room was unusable because she was physically unable to clean the room, there was no place to put the extra boxes, and it was unsanitary and dangerous.

148. Buhite said that "there are definitely no staff hours I can dedicate to cleaning out a room for breastmilk pumping" when Jeannie asked for help cleaning out the storage room.

149. Cleaning the storage room, or providing Jeannie with a sanitary, clean and private room to pump milk would not have been an undue burden to Burlington Coat Factory.

150. Buhite then told Jeannie to use her shared office space to pump breast milk.

151. Jeannie could not use this office because it was shared by both her male and female colleagues and did not have a lock.

152. Buhite then told Jeannie to "get creative" about where to pump because "Burlington doesn't deal with that [breastfeeding employees]."

153. Jeannie then resorted to pumping her breast milk in the dressing rooms located in the store or in her car. Neither place was private. The dressing room was often crowded and dirty. Jeannie felt embarrassed, humiliated and degraded.

154. Jeannie was only given time during her lunch break to pump her breast milk. Jeannie needed to pump at least four times during her shift.

155. When Jeannie let Buhite know that she needed to pump at least four times during her shift, Buhite did not respond, instead saying "I don't know what to tell you."

156. Jeannie requested to combine her one-hour lunch break with her two 15-minute breaks to be able to return home to breastfeed her son. Buhite refused.

157. It is recommended to pump breast milk every two hours for 20 minutes each time.[7]

158. Because Jeannie was unable to timely and fully pump her breast milk, her breasts became full of milk, leading to painful engorgement, which is a medical condition.

159. Jeannie's breast milk leaked often onto her clothing because she was unable to pump at work. This led to ruined clothing, humiliation, embarrassment and anxiety.

160. Jeannie also had no place to safely store her breast milk.

161. There was an employee fridge in the common area, making it unsafe for storage.

162. Jeannie brought in a storage bag to place in her office for the milk. Upon using it, Jeannie found a mouse and mouse feces inside the bag because the office was also infested with mice.

163. Sometime around October 15, 2017 Jeannie visited her doctor because she had stopped producing enough breast milk to feed her son.

164. The doctor told her that to regain milk production, she needed to pump fully and regularly. The doctor also told Jeannie that her baby would have negative health outcomes if she was not able to breastfeed him.

---

[7] *Breast pumping guide: when and how long to pump,* https://www.ameda.com/milk-101-article/when-and-how-long-to-pump/ (last visited Nov. 4, 2018).

165. In late October 2017, Jeannie again returned to the doctor, complaining of breast pain, engorgement and a low milk supply.

166. The doctor ordered Jeannie to pump fully and regularly as treatment for engorgement. Jeannie was unable to do this at work, causing additional pain.

167. Due to the stress at work, Jeannie stopped producing enough milk for her son.

168. Because Jeannie's son had to go on formula, she felt inadequate as a mother and suffered from depression and anxiety, leading to marital and familial strife.

169. After going on formula, Jeannie's baby suffered from insomnia, irritability, constipation, gas, weight loss and detachment from Jeannie.

170. Jeannie's long-term emotional effects of not being able to breastfeed include a lessened bond between herself and her baby, feeling depressed when she thinks about the lessened bond, and feeling like she failed as a mother at providing her baby with the correct nutrients for his brain development.

171. Long-term breastfeeding is very important for her child's development. Jeannie's baby has consequently suffered from delayed development and a lowered immune system.

172. Jeannie spoke with her general practitioner about her depression, anxiety and issues with breastfeeding.

**Jeannie engages in protected activity through calling the employee hotline.**

173. On or around September 18, 2017, Buhite told Jeannie, "I have seen you change the store positively after your return from maternity leave."

174. On or around September 2017, Buhite also called Jeannie to let her know that a meeting with Troy (territory regional manager, last name unknown, white, male) concerning Jeannie's store went very well and that Jeannie's store was outperforming other stores.

175. On or about September 19-20, 2017, Jeannie made a complaint to the Burlington Employee Hotline because of Buhite's continual harassing statements and unwelcome remarks about Jeannie's new baby. Jeannie stated that she feared having a baby had threatened her job.

176. Jeannie also subjectively believed that she was complaining about sex, disability, race and pregnancy discrimination under the federal employment and discrimination laws, including Title VII and or Section 1981

177. In response to her hotline report, Mike (last name unknown, white, male) called Jeannie to let her know they had received the complaint. Mike told Jeannie that he would talk with Buhite.

178. Around October 9, 2017, Mike talked with Buhite. Mike then called Jeannie to tell her that he believed everything was just a "misunderstanding" and that everything with Buhite was "fixed."

179. In mid-October, 2017, Jeannie asked to go to a doctor's appointment. Once again, Buhite, in her continued pattern of discriminatory refusal of accommodations, refused to let Jeannie go to this appointment and ordered her to reschedule.

180. In mid-October, 2017, Jeannie was ordered to rearrange the entire store with Andrew (assistant regional manager, white, male) and Mike (regional loss prevention person, white, male). During this time, Jeannie was made to move very large metal shelves by herself. Generally, these shelves are only moved by two people working together.

181. Because of the strenuous work, Jeannie's c-section wound did not heal on time. Jeannie did not heal completely until February 2018. This healing time took 28 weeks total, which was 16 weeks longer than her doctor had predicted.

182. On October 25, 2017, Jeannie received a message from a store employee saying that
Buhite told her that a male would be better in Jeannie's position as store manager.
Jeannie is still in possession of this message.

183. On October 26, 2017, mere weeks after Buhite was notified that Jeannie called the
employee hotline to complain about her, Jeannie was written up because of alleged "poor
leadership" by Buhite. Buhite also put Jeannie on a performance improvement plan (PIP).

184. Performance improvement plans at Burlington last for a period of 90 days.

185. Jeannie has never been made aware of an employee who was given less than 90 days to
address a performance improvement plan.

186. Eddie (last name unknown, white, male, store manager) was also put on a performance
improvement plan and was given the full 90 days to address the plan.

187. Prior to this, Jeannie had no write-ups or counseling about poor performance and always
had good performance feedback.

188. Andrew (last name unknown, regional assistant manager, male, white), always
complimented Jeannie's store, saying that the store, the team, the numbers and the
merchandise were all great.

189. On or about October 29-31, 2017, Jeannie as an ADA accommodation took off a few
days of work due to complications from her high-risk pregnancy and post-birth medical
conditions.

190. Jeannie was told by Buhite she was not supposed to take days off for her pregnancy and
post-birth medical issues.

**FRE 801(d)(2)(D) Admissions by Burlington Evidencing Discriminatory Animus.**
**Jeannie engages in protected activity a second time by complaining to Ann Keefe about the**
**discrimination, harassment and retaliation.**

191. Senior Vice President of Stores Ann Keefe (white, female) called Jeannie on or around
October 31, 2017.

192. Jeannie complained to Keefe about Buhite's discriminatory and retaliatory behavior
based on sex, disability, pregnancy and race. Jeannie told Keefe : "I was discriminated
against because I'm a black woman who had a baby" and "Angela [Buhite] was mad at
me because I became pregnant after being hired."

193. Keefe said that Buhite's behavior was not an issue and that Burlington could not
accommodate Jeannie for her medical issues related to her pregnancy.

194. Jeannie told Keefe that Buhite's questioning of her pregnancy and childbirth status
made her uncomfortable. Keefe responded by saying, "Buhite has every right to ask you"
those questions because Buhite is "running a business and your personal life should not
interfere."

195. Jeannie then told Keefe that Buhite had refused to let Jeannie have a slightly longer
lunch break to pick up her newborn from daycare.

196. Keefe replied that Burlington "does not accommodate people just because they have a
new baby."

197. Keefe said that Buhite did the right thing and that Burlington would not be able to run a
business if they had to accommodate every new mother in the business.

**Jeannie is fired after engaging in protected activity.**

198. Buhite was primarily responsible for termination decisions of store managers.

199. On November 3, 2017, Jeannie received a call from Keefe, saying that she was terminated effective November 4, 2017. Keefe said that Jeannie was being terminated because Keefe did not believe Jeannie could follow the performance improvement plan. (Despite the PIP only being in force for a few days.).

200. However, the Performance Improvement Plan was a pretext for allowing Burlington to terminate Jeannie due to disability, sex, pregnancy and racial discrimination and retaliation.

201. Buhite and Keefe also discussed the Plaintiff's termination.

202. A white male was then hired to replace Jeannie.

203. Since her termination, Jeannie has been diligently applying and interviewing for new jobs. Jeannie has been unable to find employment and believes this is due to her negative employment record at Burlington.

204.  Jeannie continues to experience severe emotional disturbances due to the discriminatory and retaliatory treatment she received while at Burlington, which includes anxiety, depression and insomnia.

205. In November 2017, Jeannie sought therapy from a licensed psychologist due to the severe anxiety, depression and stress she experienced as a result of the discrimination and wrongful termination.

206. Jeannie has continually suffered from severe anxiety, depression and stress and is presently seeking therapy.

## PART V. CAUSE OF ACTIONS

## COUNT I: PREGNANCY DISCRIMINATION, UNDER TITLE VII, 42 U.S.C. § 2000(e) et seq., AS AMENDED BY THE PREGNANCY DISCRIMINATION ACT, 42 U.S.C. § 2000E(K))

207. Plaintiff alleges and incorporates all the paragraphs above.

208. Defendant Burlington Coat Factory intentionally discriminated against Plaintiff Jeannie on account of her status as a pregnant and postpartum person, in violation of 42 U.S.C. §2000(e) *et seq.* by denying her equal terms and conditions of employment and by terminating her.

209. This discrimination was not experienced by other male or non-pregnant female employees of the Defendants.

210. Defendant intentionally interfered with Plaintiff's contract of employment because of their discriminatory animus towards her status as a pregnant and postpartum person. Defendant acted in a willful and wanton manner and in callous disregard for the federally-protected rights of the Plaintiff.

211. Defendant discriminated against Plaintiff on the basis of pregnancy when they, among other actions, made embarrassing statements about her pregnancy and stated that she would be unable to do her job due to her pregnancy, only to then terminate her in November 2017.

212. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered

25

from emotional distress arising from the loss of her job, the damage to her professional

reputation and the embarrassment, humiliation, and indignity arising from the

discriminatory conduct of Defendants and/or agents or employees acting on its behalf,

and the stress and anxiety caused by her wrongful termination and resultant financial

hardship.

213. As a consequence of Defendant's action, they are additionally liable for attorney's fees

and other costs and interest in pursuit of this litigation.

## COUNT II: HOSTILE WORK ENVIRONMENT BASED ON PREGNANCY UNDER TITLE VII, 42 U.S.C. § 2000(e) et seq., AS AMENDED BY THE PREGNANCY DISCRIMINATION ACT, 42 U.S.C. § 2000E(K))

214. Plaintiff alleges and incorporates all the allegations above.

215. Defendant Burlington Coat Factory was at all times an employer of the Plaintiff for

purposes of Title VII.

216. Plaintiff alleges that one or more of the agents, managers, supervisors, and/or employees

of Defendant, acting on its behalf, created a hostile work environment based on her

pregnancy and postpartum status when they engaged in making harassing pregnancy-

related statements and actions which were subjectively and objectively severe or

pervasive.   Defendant's harassing statements made it difficult for the Plaintiff to

concentrate at work. Plaintiff was also deeply offended by the unwelcome remarks.

217. Defendant had knowledge of Plaintiff's complaints of pregnancy-related harassment,

and ultimately failed to take corrective action to address Plaintiff's concerns.

218. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered

and is suffering considerable injury, including but not limited to loss of substantial past

and future salary and income, benefits and other privileges and entitlements of

employment, loss of professional status and career enhancing and advancement

opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered

from emotional distress arising from the loss of her job, the damage to her professional

reputation and the embarrassment, humiliation, and indignity arising from the

discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and

the stress and anxiety caused by her wrongful termination and resultant financial

hardship.

219. As a consequence of Defendant's action, it is additionally liable for attorney's fees and

other costs and interest in pursuit of this litigation.

## COUNT III: SEX DISCRIMINATION UNDER TITLE VII, 42 U.S.C. § 2000(e) et seq.

220. Plaintiff alleges and incorporates all the paragraphs above.

221. Defendant Burlington Coat Factory intentionally discriminated against Plaintiff on

account of her sex, female, in violation of 42 U.S.C. §2000(e) *et seq*. by denying her

equal terms and conditions of her employment and by terminating her.

222. Defendant's treatment of the Plaintiff was not experienced by others outside her

protected class.

223. Defendant intentionally interfered with Plaintiff's contract of employment

because of their discriminatory animus towards her sex. Defendant acted in a willful and

wanton manner and in callous disregard for the federally-protected rights of the Plaintiff.

224. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered

and is suffering considerable injury, including but not limited to loss of substantial past

and future salary and income, benefits and other privileges and entitlements of

employment, loss of professional status and career enhancing and advancement

opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered

from emotional distress arising from the loss of her job, the damage to her professional

reputation and the embarrassment, humiliation, and indignity arising from the

discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and

the stress and anxiety caused by her wrongful termination and resultant financial

hardship.

225. As a consequence of Defendant's action, it is additionally liable for attorney's fees and

other costs and interest in pursuit of this litigation.

## COUNT IV: HOSTILE WORK ENVIRONMENT: SEX, UNDER TITLE VII, 42 U.S.C. § 2000(e) et seq.

226. Plaintiff alleges and incorporates all the allegations above.

227. Defendant Burlington Coat Factory was at all times an employer of the Plaintiff for

purposes of Title VII.

228. Plaintiff alleges that one or more of the agents, managers, supervisors, and/or employees

of Defendant, acting on its behalf, created a hostile work environment based on her sex

when they repeatedly engaged in making unwelcome sex-based comments and

harassment. The Plaintiff was subjectively offended by the hostile work environment and

harassment. The harassment made it difficult for the Plaintiff to concentrate at work.  The

harassment was also objectively offensive.

229. Defendant and its managers had knowledge of Plaintiff's complaints of sex-based

harassment and ultimately failed to take corrective action to address Plaintiff's concerns.

230. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered

and is suffering considerable injury, including but not limited to loss of substantial past

and future salary and income, benefits and other privileges and entitlements of

employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by her wrongful termination and resultant financial hardship.

231. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## COUNT V: RETALIATION UNDER TITLE VII, 42 U.S.C. § 2000(e) et seq. BASED ON SEX AND PREGNANCY

232. Plaintiff alleges and incorporates all the allegations above.

233. Defendant Burlington Coat Factory was at all times an employer of the Plaintiff for purposes of Title VII.

234. Plaintiff alleges that one or more of the agents, managers, supervisors, and/or employees of Defendant, acting on its behalf, retaliated against her based on her sex, and pregnancy after the Plaintiff engaged in the protected activity of complaining about discrimination and a hostile work environment.

235. Plaintiff engaged in multiple protected activities, including but not limited to, calling the Burlington Employee Hotline to complain about her unfair workplace treatment on the basis of her protected class and complaining to Anne Keefe. Plaintiff also subjectively believed she was making a complaint of discrimination under the federal employment discrimination laws.

236. Defendant then retaliated against the Plaintiff when they engaged in adverse employment actions, including but not limited to: writing her up for alleged "poor leadership," putting her on a performance improvement plan and then terminating her position.

237. Because of the close proximity of the protected activities and the adverse employment actions by Defendant, including termination, a causal link can be established to prove retaliation which would dissuade a reasonable person from making or supporting a charge of discrimination. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

238. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by her wrongful termination and resultant financial hardship.

239. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## COUNT VI: ADAAA DISCRIMINATION & WRONGFUL DISCHARGE UNDER 42 U.S.C. § 12112

240. Plaintiff alleges and incorporates all the above allegations.

241. Defendant Burlington Coat Factory was at all times an employer of the Plaintiff for purposes of the American Disabilities Act Amendments Act of 2008 (ADAAA).

242. The Plaintiff suffered from profound disabilities throughout her employment.

243. At virtually all times of Plaintiff's employment, Defendant had knowledge of her disability.

244. The Plaintiff alleges that one or more of the agents, managers, supervisors, and/or employees of Defendant, acting on its behalf, subjected her to discrimination on the basis of her disability by failing to provide reasonable accommodations for her disability and/or by terminating her employment from Burlington because of this disability. Any or all of these actions, singularly or cumulatively affected her "terms, conditions and privileges of employment." 42 U.S.C. § 12112(a).

245. Defendant and its agents, managers, supervisors or employees knew of the Plaintiff's disability when they wrote her up for poor performance, placed her on a corrective action plan, and/or subsequently terminated her. These and other disparate treatments by the Defendant constitute illegal discrimination by Burlington because of Plaintiff's disability, affecting her "terms, conditions and privileges of employment." 42 U.S.C. § 12112(a).

246. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities and loss of retirement savings and benefits. The Plaintiff has also suffered from physical injury, emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignity arising

from the discriminatory conduct of Defendant and/or agents or employees acting on its

behalf, and the stress and anxiety caused by her wrongful termination and resultant

financial hardship.

247. As a consequence of Defendant's action, Burlington is additionally liable for attorney's

fees and other costs and interest in pursuit of this litigation.

**COUNT VII: ADAAA RETALIATION UNDER 42 U.S.C. § 12112**

248. Plaintiff alleges and incorporates all the paragraphs above.

249. Burlington was at all times an employer of the Plaintiff, for purposes of the American

Disabilities Act Amendments Act of 2008 (ADAAA).

250. The Plaintiff suffered from profound disabilities during her employment with

Burlington.

251. At all times of Plaintiff's employment, Burlington had knowledge of her disabilities.

Jeannie also has a record of such an impairment and/or was regarded as having such an

impairment by Burlington.

252. The Plaintiff engaged in protected activities when it informed the Defendant,

Burlington, of her disability and request for accommodations.

253. The Plaintiff alleges that one or more of the agents, managers, or supervisors of

Burlington failed to accommodate her disability and/or engage in the interactive process

with the Plaintiff and/or her physician, to determine an appropriate and reasonable

accommodation as required under the ADAAA.

254. The Defendant subsequently not only failed to engage in the interactive process, but

also retaliated against her, by subjecting her to adverse employment actions, by placing

her on a performance improvement plan, and/or subsequently terminating her. Any or all

of these actions are in violation of the Acts retaliatory provisions including but not limited to 42 U.S.C § 122013 (a) and (b).

255. Because of the close proximity of the protected activities and the adverse employment actions by Burlington, a causal link can be established to prove retaliation which would dissuade a reasonable person from making or supporting a charge of discrimination. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

256. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities, and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory and/or retaliatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by her wrongful termination and resultant financial hardship.

257. As a consequence of Defendant's action, Burlington is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## COUNT VIII: FAILURE TO ACCOMMODATE UNDER THE ADAAA 42 U.S.C. § 12112

258. Plaintiff alleges and incorporates all the above allegations.

259. The Defendant, Burlington Coat Factory, was at all times an employer of the Plaintiff, for purposes of the American Disabilities Act Amendments Act of 2008 (ADAAA).

260. The Plaintiff had profound disabilities during her employment with Burlington.

261. At all times of Plaintiff's employment, Burlington had knowledge of her disability and also has a record of such an impairment.

262. The Plaintiff informed Defendant Burlington of her disability and request for reasonable accommodations.

263. The Plaintiff alleges that one or more of the agents, managers, or supervisors of Burlington failed to accommodate her disability and/or engage in the interactive process with the Plaintiff and/or her physician, to determine an appropriate and reasonable accommodation as required under the ADAAA. Had the Defendant Burlington engaged in the interactive process, a reasonable accommodation would have been identified.

264. The defendant subsequently not only failed to engage in the interactive process, but also subjected the Plaintiff to adverse employment actions, by placing her on a performance improvement plan and/or by subsequently terminating her.

265. The Defendant is unable to show that the reasonable accommodations requested would have imposed "an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5).

266. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities, and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and

the stress and anxiety caused by her wrongful termination and resultant financial

hardship.

267. As a consequence of Defendant's action, Burlington is additionally liable for attorney's

fees and other costs and interest in pursuit of this litigation.

## COUNT IX: RACE DISCRIMINATION UNDER TITLE VII, 42 U.S.C. § 2000(e) et seq.

268. Plaintiff incorporates by reference all the allegations above

269. Title VII prohibits discrimination on the basis of race.

270. Defendant Burlington Coat Factory intentionally discriminated against Plaintiff on

account of her race, African-American, in violation of 42 U.S.C. 2000 *et. seq.*, by

denying her equal terms and conditions of employment.

271. Plaintiff's discrimination was not experienced by other non-African American

employees of the Defendant.

272. Defendant intentionally interfered with Plaintiffs contract of employment

because of their discriminatory animus towards her race. Defendant acted in a willful and

wanton manner and in callous disregard for the federally-protected rights of the Plaintiff.

Specifically, Defendant discriminated against Plaintiff when they treated Plaintiff

differently from white people in the workplace, including speaking to Plaintiff and other

black people in a harsh and abrupt tone, while speaking to white people in a kind tone.

Furthermore, Defendant fired Plaintiff and replaced her with a white male.

273. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered

and is suffering considerable injury, including but not limited to loss of substantial past

and future salary and income, benefits and other privileges and entitlements of

employment. The Plaintiff has also suffered from emotional distress resulting in physical injuries.

274. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## COUNT X: RACE RETALIATION, UNDER TITLE VII, 42 U.S.C. § 2000(e) et seq.

275. Plaintiff alleges and incorporates all the above paragraphs.

276. Plaintiff engaged in protected activity and opposition to practices made unlawful under Title VII while employed by Defendant.

277. As a result of her protected activity and opposition to practices made unlawful under Title VII, Plaintiff was subjected to an adverse employment action, in this case being wrongfully terminated and replaced by a white male.

278. A causal connection exists between Plaintiff's protected activities and the adverse employment actions taken by Defendant.

279. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment. The Plaintiff has also suffered from emotional distress resulting in physical injuries.

280. As a consequence of Defendant's action, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## COUNT XI: RACE DISCRIMINATION UNDER 42 U.S.C. § 1981 AGAINST BURLINGTON & BUHITE

281. Plaintiff incorporates by reference all the allegations above

282. Section 1981 prohibits discrimination on the basis of race.

283. Defendants intentionally discriminated against Plaintiff on account of her race, African-American, in violation of 42 U.S.C. § 1981 by denying her equal terms and conditions of employment.

284. Plaintiff's discrimination was not experienced by non-African American employees of Burlington Coat Factory.

285. Defendants intentionally interfered with Plaintiffs contract of employment because of their discriminatory animus towards her race. Defendants acted in a willful and wanton manner and in callous disregard for the federally-protected rights of the Plaintiff. Specifically, Defendants discriminated against Plaintiff when they treated Plaintiff differently from white people in the workplace, including speaking to Plaintiff and other black people in a harsh and abrupt tone, while speaking to white people in a kind tone. Furthermore, Defendants fired Plaintiff and replaced her with a white male. As a direct and proximate result of this injury from the Defendants, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment. The Plaintiff has also suffered from emotional distress resulting in physical injuries.

286. As a consequence of Defendants actions, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## COUNT XII: RACE RETALIATION UNDER 42 U.S.C. § 1981 AGAINST BURLINGTON & BUHITE

287. Plaintiff alleges and incorporates all the above paragraphs.

288. Plaintiff engaged in protected activity and opposition to practices made unlawful under Section 1981 while employed by Defendant.

289. As a result of her protected activity and opposition to practices made unlawful under Section 1981, Plaintiff was subjected to an adverse employment action, in this case, wrongful termination and being replaced with a white male.

290. A causal connection exists between Plaintiff's protected activities and the adverse employment actions taken by Defendant.

291. As a direct and proximate result of this injury from the Defendants, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment. The Plaintiff has also suffered from emotional distress resulting in physical injuries.

292. As a consequence of Defendants actions, it is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## COUNT XIII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST BURLINGTON & BUHITE

293. Plaintiff alleges and incorporates all the above paragraphs.

294. Defendant's conduct toward Plaintiff was outrageous, extreme and intolerable.

295. Defendant's conduct was intentional or reckless.

296. Defendant's conduct included denying Plaintiff disability-related accommodations ordered by her doctor, preventing or delaying Plaintiff's doctor's appointments, refusing a place and time for Plaintiff to pump her breast milk, ordering Plaintiff to do heavy lifting while on maternity leave and while healing from surgery, and failing to provide reasonable maternity leave.

297. Defendant's conduct caused Plaintiff physical injury, including but not limited to: exacerbated preeclampisa, fainting, dizziness, early contractions, hemorrhoids, back pain,

headaches, extreme swelling, dangerously high blood pressure, emergency c-section, engorgement, prolonged healing from surgery, inability to produce breastmilk, inability to have additional children and insomnia.

298. Defendant's conduct caused Plaintiff severe emotional distress in the form of debilitating anxiety, depression, and stress. This emotional distress has effected all areas of Plaintiff's life, preventing Plaintiff from enjoyment in life.

299. There is a causal connection between Defendant's conduct and Plaintiff's physical and emotional injuries.

300. A reasonable person would not expect or tolerate the abuse of Plaintiff by Defendant.

301. Defendant abused its position of authority over Plaintiff when it engaged in extreme, outrageous and intolerable conduct.

302. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities, and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by her wrongful termination and resultant financial hardship.

303. As a consequence of Defendant's action, Burlington is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

39

## COUNT XIV: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS AGAINST BURLINGTON & BUHITE

304. Plaintiff alleges and incorporates all the above paragraphs.

305. Defendant's conduct toward Plaintiff was outrageous, extreme and intolerable.

306. Defendants could reasonably foresee that their conduct would cause physical injury and resulting emotional distress.

307. Defendants' conduct caused emotional shock to the Plaintiff, which resulted in physical injury.

308. An unbroken chain of causation exists between the Defendants' conduct, Plaintiff's emotional distress and Plaintiff's physical injury.

309. Defendants refused Plaintiff disability-related accommodations, including but not limited to, not allowing her to sit or drink water, making her lift heavy boxes and shelves and denying her a time and place to pump her breastmilk.

310. Defendants' action put Plaintiff in a state of shock, anxiety, depression and severe emotional distress.

311. Plaintiff's emotional state caused Plaintiff the physical injuries, including but not limited to, an inability to produce breast milk, increased heart rate, dangerously high blood pressure and insomnia.

312. The emotional distress and physical injuries have effected all areas of Plaintiff's life, preventing Plaintiff from enjoyment in life.

313. Defendant abused its position of authority over Plaintiff when it engaged in extreme, outrageous and intolerable conduct.

314. As a direct and proximate result of this injury from the Defendant, Plaintiff has suffered and is suffering considerable injury, including but not limited to loss of substantial past

and future salary and income, benefits and other privileges and entitlements of employment, loss of professional status and career enhancing and advancement opportunities, and loss of retirement savings and benefits. The Plaintiff has also suffered from emotional distress arising from the loss of her job, the damage to her professional reputation and the embarrassment, humiliation, and indignity arising from the discriminatory conduct of Defendant and/or agents or employees acting on its behalf, and the stress and anxiety caused by her wrongful termination and resultant financial hardship.

315. As a consequence of Defendant's action, Burlington is additionally liable for attorney's fees and other costs and interest in pursuit of this litigation.

## VI. RELIEF SOUGHT

**WHEREFORE**, the Plaintiff Jeannie Quinteros respectfully requests this Court award economic damages to be proved at trial, and in addition:

A. Enter judgment for the Plaintiff Jeannie on all Counts, in an amount no less than 10 million dollars ($10,000,000.00)

B. Declare that the conduct of Defendants is in violation of Title VII, Section 1981 and Virginia Common Tort Law.

C. Award Jeannie reinstatement, punitive damages, full back pay and front pay, including salary, benefits, entitlements, loss of professional status and career-enhancing opportunities, bonuses', cash awards, loss of retirement savings and benefits and other remuneration and privileges of employment retroactive to the date of any unlawful employment action found to have occurred in this case.

D. Award Jeannie compensatory damages for emotional distress and physical injuries and loss;

E. Award Plaintiff pecuniary and out of pocket expenses;

F. Order Defendants to pay all reasonable attorney's fees, court costs, and expenses incurred by

Plaintiff as a result of Defendants' actions and inactions, as well as pre-judgment and post-

judgment interest; and

G. Order such other equitable and legal relief as the Court deems just and appropriate.

## VII. JURY TRIAL DEMANDED

Plaintiff demands a jury trial for this action on all counts

Respectfully Submitted,

/s/Elyssa Helene Katz Geschwind
VA Bar No. 87558
McCree Ndjatou PLLC
1828 L Street NW, Suite 600
Washington DC 20036
T (202) 290-3724
egeschwind@mnlawyerspllc.com
Monday November 12, 2018

## CERTIFICATE OF SERVICE

A copy of this Complaint was filed via ECF on Monday November 12, 2018.

/s/ Elyssa Helene Katz Geschwind
